The last case on today's docket is the case of People of the State of Illinois v. Richard Friend. And we have Ms. Sharon Shanahan for the appellant, and we have Mr. Gregory Skinner for the athlete. Good afternoon. Good afternoon. Good afternoon, Mr. Sanchez. Welcome. Thank you. You may proceed. The entire stop in question here was about 22 minutes long. Virtually all of the evidence is based simply on the video recording that was taken from the police officer's car. A little bit of testimony by the police officer himself, and then basically the parties said, watch video, and then they got their ruling. So the trial court concluded that the 22-minute delay impermissibly extended the stop. I have to say that really regardless of the ultimate outcome in this case, I think there are three important questions that this court needs to consider. First, should a short period of time by a police officer in which he attempts to obtain consent to search before requesting a canine sniff be found unreasonable? Second, can a refusal to consent to a search be a factor which, combined with other factors, leads to reasonable grounds to extend the duration of a stop? And third, is it reasonable to expect that a canine would arrive at a traffic stop within just a couple minutes of the time that it was requested? There are some general principles that we're all aware of in traffic stop cases like this. Clearly, a police officer can stop a vehicle for a minor traffic violation, and the officer may briefly detain the driver to request a driver's license and to conduct a warrant check. What right does the officer have to question and separate the passenger? What was the basis for that? Well, when he first arrived, I mean, there's no concern over safety, I would think. Well, we didn't know that. We really don't know anything, and I think it's important that the passenger in this car really couldn't even prove who she was. She had no driver's license, no identification. She gave them her name and where she was from, and so they were checking on that while the police officer was dealing directly with her. Is that routine for an officer to question the passenger? That's not something I can state, too. It didn't come up at the hearing, nor did it come up in the video. I think it is certainly routine to approach the driver first, and he did ask for identification from both of them, and they were... Would that be reason for him to prolong the stop and try to... I don't think so. You think so? I think that they have two people to deal with here, and it's... What was the arrest in this case? Why did he stop the car? What was the arrest? Why did he stop the car? He stopped the car because the lights were on, right? Stop. Pardon me? Because he left his lights on bright and did not dim them. Lights, or bright lights. Yes. But as I say... And were there any tickets to him for that? Did he give tickets for that? Yes. I don't think so, but as I say, the parties in the order entered by the trial court on June 3, 2011, the parties did stipulate that there was a probable cause for the stop. And again, reading from that order, at issue are the length, scope, and duration of the stop. So why he stopped the car is immaterial. No, it's immaterial, but I'm just wondering, as soon as he stops the car for the lights, why then is he inquiring of the passenger, and you're saying that it's reasonable for him to discern her identification. What if she said, you know, I don't have to give you my name or ID. What was he to achieve with that, and how does that relate at all to the bright lights being on? Well, again, I think we need to look at the order that is in question here, which doesn't deal with the reason for the stop. However, I also think for officer safety, it's important to know who they are dealing with. Let's say, for example, the reason that this woman did not present identification was because she's a dangerous wanted fellow. It's nice to know who you're talking to. It's nice to know whether the people that you're talking to are safe. It was dark when this occurred, and it was important for them to know. Well, you say that we have to get beyond the fact that there was probable cause for the stop of the bright lights being on, but how does any of what happened after that relate to the fact that he stopped his car for having its brights on? He stopped the car for having the lights on bright. He goes through the routine things that any traffic stop allows him to do, which is to do a warrant check, get a driver's license, get proof of insurance. And that all came back negative, I guess, with the exception that there was a prior on the driver, right? There was quite a bit of prior. Okay. But while he's… And is the car out of state? Yes. Okay. The first thing this police officer notices, the first thing that puts him to wondering is the extreme nervousness of this driver. He was stammering. He was stuttering. He was shaking. He was really, really nervous. And certainly that is a good reason to put a police officer's radar up. In fact, the police officer testified that he is trained to notice things like this. An average person is not that nervous for being stopped on a routine traffic stop. So he immediately notices, before he has done the warrant check, before he has run the driver's license, before he's even been given these items by the defendant, he's already noticed that. He very quickly, in the time that he's allowed to do, does what he's allowed to do, which is run a warrant check. Here's a defendant that has a lot of, some convictions and a lot of charges. I'll put it that way. And so he's got two things going on here right now. He's also got a car that is not only just out of state, but is basically crossing three states. Started in Kansas City, came all the way through Missouri, going through Illinois on the way to Indiana. The back of the truck is full of black trash bags. This just isn't sitting right to the officer. So he's got several things that have made him suspicious, things that he has a right to consider as suspicious. He asks the defendant for consent to search the truck. The defendant refused. And the officer testified that, in his experience, people who refuse a search usually have something to hide. And I think that's one of the things I mentioned here that I think this court needs to consider, because I don't know that it's really ever been decided before, is can the refusal, defendant's refusal to have a search, can that, not alone, but can that, in conjunction with other things, lead to an ultimate conclusion that validly allows a police officer to extend the length of the stop. Now, remember, we're not talking about arrest here. We just want to lengthen the stop. And I point to this court in our brief to the fact that if someone refuses a breathalyzer test, that's consciousness of guilt. And so if that kind of evidence of a driver's refusal to expose himself to something like that can be an inference regarding the state of mind, then I believe that it's reasonable when you take the extreme nervousness, when you take the drug history, when you take the out-of-state vehicle, when you take all of these trash bags that were in the back of the truck, and then you add to it the refusal to allow the search. Although the defendant has a right to refuse that search, a person who stopped also has a right to refuse a breathalyzer test. That doesn't mean you can't draw some conclusions based on it. People v. Roberts says evidence of a refusal to undergo any potentially incriminating procedure is similar to other circumstantial evidence of consciousness of guilt, which may be inferred from a defendant's conduct. And again, there we're talking about proving someone guilty of something. We're talking about a step down from there. We're talking about probable cause for arrest. We don't need anything nearly that much. We just need, can we lengthen this search a little bit longer? Because there is a reasonable suspicion of criminal activity. Yes. And that's what I'm saying, is all of those things, it is a totality test. It is not, even though any one of those things in and of themselves may be insufficient, when you add them all together, when you add the extreme nervousness, when you add the prior drug charges, when you add the refusal to search, when you add the out-of-state car, when you add all of these trash bags in the back, when you add all of those things together, even though any single one of them, or even a couple of them, might not allow to extend the search. At least for 22 minutes. Well, he asked for the dog. 22 is okay? 22 is the total time. Right, right. And the other one that people versus model it is 55 minutes. That's okay? Well, what we have here is from the time the police officer, from the time the defendant refused the search, the police officer then asked for, he said, I can quickly find it here, he said, how fast can we get a drug dog here? He got on the radio and asked, how fast can we get a, you can hear him saying in the video, he's really, really nervous. He's coming from Kansas back to Indiana. Is the defendant in the police car at this point? No. So did you see him being really, really nervous, or is this the police officer's subjective opinion? I believe that at the time he made that comment, the defendant was still in the truck. At one point, they start out in the truck. Then the defendant gets out. There's quite a bit of conversation with the police officer and the defendant outside of the car. Is the camera going from the police car at that point, and you can see that? Well, it's night. The camera is in the police car, which is the dashboard. So it's enough of a distance, certainly much farther than I am from you. And does he ever get into the police car and you visualize him in the police car? He's not put in the police car until after the dog learns. In fact, he's told he can leave.  And leave his car, his truck? Leave his car, yes. He doesn't have to stay. He was twice told that. And hoof it, I guess. I mean, it doesn't sound like a very practical solution. However, it was his choice. He can go down the street to Denny's and drink coffee while this goes on. You keep saying that one of the indicia of, I guess, suspicions is that he has out-of-state plates. How many people have out-of-state plates that travel? What was it? Was it 70 or 55 that was on? What he was on? Yeah. I don't remember. It was one of the... It wasn't just that he was out-of-state plates. And, well, first of all, two part answers. Number one, he's got the Illinois, Indiana license plates. He's coming from Kansas City, Missouri. Yeah, but how many thousands of cars travel those highways? Absolutely, I agree. Coming, you know, several... If I was trying to... Believe me, if I had received a brief in which the only reason was that someone was traveling from Missouri to Indiana, I would have confessed there in the case. Well, are you aware of any history of perhaps that being a pattern that goes on in that area? A pattern of going... Of stopping out-of-state cars. The record does not reflect that, but I think that the fact that... I'm going to get way under the record here if I say a lot more. I know I've had cases where defendants coming from New Mexico to Rockford, you know, the fact that there's nothing illegal about that either. Arizona. Arizona. All, you know... Denver. That was a big surprise to me. Denver. They're coming down. Texas. Florida. New... So, I mean, I used to live in Johnson County, and heaven forbid that you drive a white van through Johnson County, especially if you're Hispanic. I'm being politically incorrect here today, but that's true. I'm not saying that that is a big thing. In fact, if I were going to list these things in order of most important to least important, that would be the last on the list. But is it permissible? A permissible... Is that... Are you on a fishing expedition when you consider the fact that they've got an out-of-state license plate? I don't think it's at all impermissible to consider the fact that not only do they have an out-of-state license plate, but the fact that they are... He's coming not even from the state that he's from. It's not like he was coming from Indiana. He's coming from Missouri with an Indiana car and an Indiana plate. It's a little point. I don't think it's a big point, but I think it is another little thing. Along with the fact that you can consider if they choose to invoke their constitutional right to not have their vehicle searched, that that can be considered. You have a constitutional right not to do the rest of your stuff, too. And yet the refusal to do it can be considered. I think the two big things that immediately that I think are very important here is the extreme nervousness and the history of drug crimes. And we'll be able to see that apart from the officers stating that. That in the video or some... You're not sure that we'll be able... I just recently spent 50 minutes looking at a video. I know, aren't they fun to watch? What are you asking what they will be able to see on the video? Will we be able to see anything about this defendant on the video related to his nervous behavior? Yes. Yes? Okay. I mean, I think you will be able... The camera's really close. More than the people who are just mine. They got you. Cool. I mean, like I said, it's far enough away. Yes. Yes, I think you can. And then you do have, obviously, even when this guy, police officer, not just his testimony, but when you're hearing his mic, you're hearing him say that he's really, really nervous. When he's calling in. Yes. Uh-huh. And so I think that that's important that he said that at that time at approximately... You've been watching videos. I've been watching videos. I have at approximately 7 minutes and 14 seconds into this video, the police officer says he's really, really nervous. And then he says at approximately 7 minutes and 23 seconds, he's coming from Kansas back to Indiana. Prior charges for methamphetamine, marijuana. And I'm going to try and do a consent. That's what you hear him say in the first 7 and 8 minutes, roughly, in that period of time. I'm going to run out of time here, but I just have to say something about the time for a dog to arrive. This is Southern Illinois. The only place in the state of Illinois that could possibly get dogs to traffic stops in the time frame required by this court, in the time frame required by People v. Baldwin, would be possibly downtown Chicago. And what was the time frame again? 12 minutes here. Baldwin said 2 minutes,  was People v. Baldwin. If this court requires, sets such an imposition that a dog has to be, has to arrive within 12 minutes, then we have vitiated the entire dog sniff law. You can't get, Troy has a population of 10,000. You can't get, expect them to get a dog there in moments. Call a dog in every car. You can't get another police car there that quickly. Every car there, you have to have a dog there. It would have to. Was this the state police? Was this the state police? Police. Okay, it was local police. Thank you. May it please the Court of Counsel. First of all, I'm going to elaborate on a couple of things that are confusing, and a couple of things in the record maybe that came up. First of all, the stop, as depicted on the, is in excess of 35 minutes. It's not 22 minutes. From the time that this video kicks in, when he pulls up behind this vehicle, until the time when the dog alerts, at least according to them. I never see an alert, but that's in excess of 35 minutes. No, but the question was when did the dog get there, not when did it alert. I think that was the question that was asked. I might be mistaken. Well, I thought it was how long, I thought the question was when the entire stop was. Oh, no. Oh. Well, how long did it take for the dog to arrive after the initial stop? From the initial stop? It was, the canine officer arrived 28 minutes and 45 seconds after the initial stop. And I just want to point out that I mentioned it in my brief, and it was termed dubious in the reply brief, but the case law is that the critical time period in the case is the period of time from the initial stop of the vehicle until the dog's alert. In this case, that's nearly 35 minutes. That's from the Koutsakis case, which has been cited in other cases, and I did not find any law to the contrary. Are you saying that you can't see in the video whether or not or when or where the dog alerts? No. No, you cannot. The officer announces it at 35 minutes and 20 seconds, the alert. And the other thing that you'll also see on the video is that  the defendant was traveling from Kansas, from his parents' house, which you saw in the video, to his home in Indiana. He was visiting his parents in Kansas, not Kansas City, Missouri, Kansas, the state of Kansas. So that's where he was coming from, going to Indiana. And what state place did he have? I believe Indiana plates. He lives in Indiana. He was visiting his parents in Kansas. And there were no tickets issued. I think the reason for the stop is not in the material because it was because of bright headlights, so maybe less intrusive is probably the better choice there. But the other thing I really want to point out is that this matter was presented to the court in an argument. There was a videotape that was presented as a joint exhibit. There was brief testimony from this patrol officer. And then the sides were to submit a written argument. The defense submitted a four-page brief with case law. The state submitted this two-paragraph letter, that's part of the record, which cites two cases which are not even part of any of the briefs. The arguments that have been advanced here today, those arguments weren't made in the lower court. The arguments pertaining to the using a refusal as a justification for a search. The article about Detroit being a small town, although where this occurred is five minutes from the state police headquarters, which is where they called. Right there at the interstate in Collinsville, five minutes up the road from there. And the discussion about the critical time period, which I've set forth the Koutsakis case about that. As you can see, the court's order is nearly a six-page order, references the timeline, goes through the facts, makes a specific finding that the officer did not have specific articulable facts, which gave rise to reasonable suspicion, justifying an investigator's stop in accordance with the Fourth Amendment. I mean, as the court knows, those findings and facts are entitled to great deference. Those findings certainly, if you review the actual evidence and what was presented, are not against the manifest rate of that evidence. The findings and facts are analogous to the cases that support the defendant's position with respect to the timelines and the fact that this was unreasonable in duration and scope. The officer who was involved here did not have any specific training in drug and addiction. That did come up. He did not. There was no testimony. There was no testimony, nothing about stuttering or stammering. He did testify that the defendant was nervous. There's plenty of case law that nervousness does not rise to the level of something that gives a reason to extend the stop. There's references in the record to drug arrests. There are no references to any drug convictions. So any allegation of multiple drug convictions are just false. I mean, there is a record on this. In the record, there was drug arrests. There still was no convictions. So, based on everything I've put forth, I believe that this court's ruling was not against the manifest rate of the evidence. I believe the findings and facts are entitled to deference, and I do not believe there's any justification for doing anything other than issuing a ticket six minutes and 55 seconds after this gentleman determined that neither of these parties had a warrant. He did have a valid license. At that point, he should have issued the ticket, and they could have gone on their way. As for these three particular novel issues that were brought up, none of those are supported by any case law, and I don't see why this... I don't know how the refusal to consent could ever be a justification for extending a stop. And that would conclude my presentation. Unless any of the panelists have further questions. No further questions. Thank you. Does this have any rebuttal, Ms. Chandler? Very briefly, Your Honor. The question I was addressing as far as the time frame was how long it was extended past normal. And according to my records, by the time that they determined that he had a valid Indiana driver's license, that he did have prior drug charges, and the comment that I read to you that he was very, very nervous was about 9 minutes and 27 seconds. You're saying that 9 minutes was at the point where he had concluded? Or extended beyond the point where he... At about 9 minutes, he had checked the driver's license and gotten the criminal feedback, basically. The canine officer arrived at 27 minutes and 6 seconds. Well, these are hard to watch, to figure out. Roughly then, I don't disagree with any of the time frames that counsel for the defendant. And then the dog officer informed the parties that the dog had alerted to a bag in the truck at about 35 minutes and 19 seconds. Did you see any reference to what the alert was? What did the dog do? Is that within sight? Is it on the video? It's on the video. That the dog does something, and then the officer says he alerted? Yes. What the dog did... It's been a while since I watched this video. That's one of the problems. You can go back and read something again, but I don't have... I'm going to say, as a general rule, these dogs, when they alert, they do that because they're going to get a reward. And so they alert, and then they go to their hands. Can you tell me what the dog did? And if you can't remember, I don't want you to guess, but you think that we'll see it on the video. I do. I think so. Touching briefly on when does the clock stop. Is it when the dog arrives, or is it when the dog alerts? Two things I would point out. People v. Baldwin, the very case that the trial court relied on, the one that had the two minutes is too long, even that judge stopped his clock when the canine arrived, not when he physically started to sniff. The other thing I'd like to point out is that there was a delay in this case from the time the dog arrived until the sniff started because this was not an invasive sniff. This was a walk the dog around the outside. If the windows are down, the dog is going to jump into the car. They don't want the dog to jump into the car, so they ask the defendant to roll up the windows of the car, and there is a little bit of a back-and-forth about that. So he's still in the truck? No, the defendant's out. Oh, but they asked him to go and roll up the windows. Yes, to go in and roll up the windows. And so that was a little bit more of a delay. And, again, one of the things I ask this court to consider, regardless of the ultimate outcome of this case, is how fast do we have to— I guess the two most important things to me in this case is how fast does a dog have to arrive, particularly in southern Illinois, particularly outside of any urban area, given the fact that even getting another police officer takes time and the cost of these dogs is extraordinary. A county is lucky to have one in a county, and so I think that's an important thing for this court to consider. I also think that it's important for this court to consider whether the refusal of a consent to search can be a factor in determining whether or not a stop can be extended. And, again, this is just extending a stop. This is not probable cause to arrest, and it's certainly not probable cause to be there. I mean, beyond reason not to be there. There are no other questions. Thank you, Ms. Shanahan. Thank you, Mr. Turner. Welcome aboard, Mr. Santos. Thank you all. That concludes our session for today. We will reconvene tomorrow morning.